# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 7, 2006 Session

# PARRIS ROOFING & SHEETMETAL CO. v. SCR ELECTRIC, INC.

**Appeal from the Chancery Court for Hamilton County**
**No. 03-1024     W. Frank Brown, III, Chancellor**



**No. E2006-0263-COA-R3-CV - FILED FEBRUARY 27, 2007**

Parris Roofing & Sheetmetal Co. ("Plaintiff") sued SCR Electric, Inc. ("Defendant") seeking, in part, payment for work Plaintiff had done pursuant to an alleged agreement between Plaintiff and Defendant. The case was tried without a jury and the Trial Court entered an order finding and holding, *inter alia*, that Plaintiff and Defendant did not have an enforceable agreement, but that Plaintiff was entitled to recover $3,613.50, from Defendant in quantum meruit. Plaintiff appeals to this Court claiming that the Trial Court erred in finding that the reasonable value of the work performed was only $3,613.50. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and SHARON G. LEE, J., joined.

Robert S. Thompson, Cleveland, Tennessee for the Appellant, Parris Roofing & Sheetmetal Co.

Erskine P. Mabee, Chattanooga, Tennessee for the Appellee, SCR Electric, Inc.

# OPINION

## Background

Plaintiff and Defendant were subcontractors working on a renovation project at the Pleasant Grove School in Dalton, Georgia. Plaintiff had a contract with the general contractor to re-roof the school, and Defendant was handling the electrical work on the project.

A problem arose with the plans for the project and instead of routing the electrical work through the building, Defendant was forced to find another way to route the electrical work. Defendant had two options, route the electrical conduit underground by trenching, or run it over the roof. Gary Douglas Cleaver, co-owner and president of Defendant, and Henry Apple, Plaintiff's vice-president and estimator, met on the job site to discuss the situation. As a result of this conversation, Plaintiff performed work that included installing pitch pans so that Defendant could run the electrical work across the roof.

After completion of the work, Plaintiff submitted an invoice to Defendant in the amount of $10,828.00, for "Manufacturing and Installing 45 extra pitch pockets for Pleasant Grove School." Defendant did not pay this invoice. After telephone conversations failed to resolve the dispute, Plaintiff sued Defendant seeking payment. The case was tried without a jury.

David Randall Parris, president and owner of Plaintiff, testified at trial. Mr. Parris testified there was no written contract to cover the work at issue and that he was not involved in the conversation between Mr. Cleaver and Mr. Apple. Mr. Parris testified that pursuant to the conversation between Mr. Apple and Mr. Cleaver, Plaintiff agreed: "To temporarily waterproof the pipe supports that they were putting in the roof. And then as we got in the process of tearing off and reroofing, we had to do a permanent repair, a new application on it." Mr. Parris explained that Defendant would make a penetration or hole in the roof and then

> We had to put down a layer of mastic plastic roof cement, spread it out, put the pitch pan in, set it in this plastic roof cement and put screws in all the corners, come back and put another layer of mastic plastic roof cement around the whole thing, and then come back with another layer of this material as such (indicating), and then as it lapses on the corners you put more plastic, you know, roof cement on each corner.

Mr. Parris further explained

> we would do a temporary repair on these type supports, which involved, you know, bringing it - - it had a rubber roof on it. We had to bring the rubber back in, fill in the void around the pipe if there was a void there, bring the rubber back around it, put a new piece of what we call a five-inch tape, which would be glued to the existing old rubber, and tighten it up around the pipe.…[Then] we had to go on with our

roofing project, which meant tearing the old existing roof off and dispose the debris. You know, we had to work across all these conduits and so forth. Then we had to come back after we had the old roof torn off and install a new roof, which consisted of two layers of insulation and two plies of, you know, felt mopped in in hot asphalt, and then attach this white roof cap sheet.

Mr. Parris testified that installing a pitch pan is a two man operation and would generally take one man-hour to install the temporary pitch pan and three more hours to install the permanent one for a total of four man-hours per pitch pan. Plaintiff typically charges $35 per man-hour for work of this type, and Plaintiff billed Defendant for 180 man-hours at $35 per hour. Mr. Parris testified that Plaintiff did not keep records of the actual man-hours and who worked them because "[i]t was an ongoing project. The men worked on it. We've done this off and on for years of doing this, and we arrived at, you know, this hourly - -." He explained that ongoing meant that the men were already on the job site doing other things and when Defendant would cut a hole in the roof they would inform Plaintiff's men who would then go over and patch it. Mr. Parris admitted that the labor charge is not the actual time spent on each pitch pocket but rather a standard charge: "That was arrived at from 40-some-odd years of being in the business and coming up with how much it takes labor-wise to do a pitch pan." Plaintiff has no records of the actual time spent on each pitch pocket. Mr. Parris admitted that he was on the job site "maybe once a week" and that his job foreman never told him how much time it took to actually install each pitch pocket.

Mr. Parris testified that the invoice submitted to Defendant included a $3,234 charge for materials, a 40% profit on the materials, and the labor charge for 180 hours. The invoice does not contain a breakdown of any of the charges, but rather simply states the total amount due. When asked, Mr. Parris admitted that during his deposition he testified that normally Plaintiff uses a figure of cost, plus 10 or 15%. He further admitted that he testified during his deposition that it is Plaintiff's normal procedure when working on a cost-plus basis to provide invoices for materials and time records if a customer requests them. Plaintiff did not provide invoices for materials and time records to Defendant because, Mr. Parris testified: "They never asked for it." Mr. Parris also admitted that after his phone conversation with Mr. Cleaver regarding the dispute about the price, he was "trying to come up with another number."

An exhibit was introduced at trial that Plaintiff testified represented the cost calculations used to arrive at the total invoice price. The exhibit lists materials including 5 rolls of membrane, 25 buckets of roof cement, 45 pitch pans, 29 gallons of pourable sealer, aluminum fibrated coating, 1 gallon of quick primer, 2 tubes of NP-1 caulking, and 1 roll of 5" seam tape. Mr. Parris admitted that he testified during his deposition that the only material costs that his job foreman turned in for the patchwork were one gallon of quick prime, NP-1, and one roll of 5" tape. Everything else that Plaintiff listed as a material cost on the exhibit is just an estimate. Mr. Parris stated: "It's an accurate estimate.…The part that I was emphasizing there, that's all that he turned in. If he had turned in any more, it would have probably tripled that amount.…He didn't turn it in, so it wasn't on the billing." Mr. Parris testified that hard costs included in the total invoice price included workmen's compensation of approximately twenty-five percent per dollar, general liability

of approximately eight percent, state unemployment, FICA, and Medicare. Plaintiff pays its employees an average of $15 per hour.

Mr. Parris testified that installing the pitch pans:

> added more labor to my contract that I already had that I couldn't get anything else out of, plus the fact that - - anytime there's a roof problem, it's around a roof penetration. Ninety-nine percent of the time it's around a roof penetration. So we've installed 45 penetrations here, and we had to warrant the roof. Anytime we can get anything off of the roof, we want it off of the roof.

He further stated:

> If those penetrations had not been in that area, we would have just walked right through [the re-roofing job]. It probably added, in that particular area, added 75 percent more labor to have to work around - - not counting the pitch pans, just to work around them, and tearing off the exiting (sic) roof and installing a new roof.

When asked about any equipment that Plaintiff had on the job site that might have interfered with Defendant's ability to trench for the electrical conduit, Mr. Parris testified that Plaintiff had an asphalt kettle and a dumpster near the building that they could have moved in approximately thirty to forty-five minutes without slowing them down on their portion of the project. Plaintiff's other materials were located in an area that would not have obstructed Defendant's ability to trench and those materials could have been moved in three to four hours if necessary.

Mr. Parris testified that when he had not heard anything for several months after sending Defendant the invoice, he called Mr. Cleaver. Mr. Parris stated:

> I just called and inquired, you know, about it, and he informed me that he had an agreement with Mr. Apple, that it was $1,800. I didn't know anything about the $1,800. You know, Mr. Apple was no longer employed at the time, so I - - you know, we went from there going back and forth trying to resolve the issue.

Mr. Parris never spoke with any of Defendant's people before the work was done and never spoke with Mr. Apple about the work at issue in this case prior to the work being done.

Henry Lee Apple, Jr. testified regarding his meeting on the job site with Mr. Cleaver. He testified that the architect's representative introduced Mr. Cleaver to Mr. Apple and then left and that no one but Mr. Cleaver and Mr. Apple participated in the conversation that led to the work at issue in this case. Mr. Apple testified that Mr. Cleaver:

-4-

said he was going to have to - - since he couldn't run it the way that it was shown, he was either going to have to go underground or he was going to go across the roof, one of the two.

He didn't know exactly how much electrical work he was talking about, what size conduits, didn't know how - - if he ran across the roof, how wide the supports were going to have to be, how many supports there would be or anything like that at that particular time.

Mr. Apple testified: "I told him we could do the work on a cost-plus basis and we would treat him right." No specific figures were discussed and Mr. Apple and Mr. Cleaver never discussed the number of pitch pockets to be installed. Mr. Apple stated: "We didn't talk a nail-down figure of any kind. I just told him cost plus, I'd treat him right, and that was it." Mr. Cleaver and Mr. Apple never discussed what cost plus meant. Mr. Apple testified that Mr. Cleaver did not tell him that he could trench for $1,800, and never asked that the price be kept under a certain amount. The conversation between the two men lasted approximately three to five minutes and Mr. Apple did not have any further conversations with Mr. Cleaver after that day. Mr. Apple could not remember if he talked to Mr. Parris about the conversation with Mr. Cleaver before the work was done.

Charles Ronald Hall, an estimator for J.D. Helton Roofing, a competitor of Plaintiff's, testified at trial. Mr. Hall reviewed details regarding the project at Pleasant Grove School including photographs that depicted the work on the roof. Mr. Hall testified that he understood the work that was done as:

a two-step process. One, the roof had an existing rubber roof on it and the 45 posts had to be put in place, which meant cutting 45 holes through the existing roof, removing insulation down to the deck, fastening those and then putting everything back, flashing it to where it doesn't leak until he actually came and did the tear-off later.…That's the first step. And then once Randy actually tore the roof off, after all of this was put in place, as I understand it, with a Garland roof system, they were very specific about how they wanted their pitch pans in and flashed, and he went over that in detail with me too. We talked about, you know, how it needed to be done to meet the Garland specifications.

Mr. Hall gave an estimate: "[f]or the pitch pans we were looking at $150, but that's the second step. The first step was the temporary 45 places that were potential roof leaks where these post penetrations were, and I estimated that at $100 apiece," for a total of $250 per pitch pan. Mr. Hall admitted that although he has been to the Pleasant Grove School, he has not gone up to the roof. Mr. Hall opined that four man-hours per pitch pan is reasonable and that the charge for the amount of materials on the invoice is reasonable. Mr. Hall testified that J.D. Helton could not have done this job for $1,800, and that he would have charged more for the labor than was charged.

Gary Douglas Cleaver testified about why Defendant did not trench, or run the conduits underground. He stated: "When I got to the job site and I seen that [Plaintiff] had their tar kettle, their dumpsters, materials and everything was completely blocking the whole alleyway right there."

Mr. Cleaver also testified regarding his conversation with Mr. Apple stating:

That conversation with Mr. Apple, as I told him, I said, the reason we're standing on the roof right here is because I've got one of two ways of doing this. I can either trench it underground, and you'll have to get all your equipment and move it to another place. If you'll look at this drawing right here, there was no other place. School was going on. This was in January. This was not in the summer.

School was going on. Teachers were parking in the area. There was only - - we had tight quarters. We were on penalty. We had to get the phasing done on the job. I had to get my conduits from this point (indicating) to this point (indicating) and not try to slow Mr. Parris or anybody else down in the process. All I was trying to do was help.…I told Mr. Apple, in order for us to do this trenching and go underground where he would have to move all of his equipment, which somebody show me where they could put it on this property besides right there where it was, I told him, instead of interrupting him and causing him a delay to close his window on getting his work finished that I had the option of running this across the roof right here.

I told him I had an $1,800 figure that it would cost me in doing the trenching and coming up the building an going back inside the building as opposed to if he wanted to put pitch pockets and me put stands down through her to run the conduits, I would do that. And at that point right there, we discussed it.

I told him, I said, can you do it for $1,800?

He said, I don't think it will be that much, was the very exact words the man told me.

And I told him, from that point on we would go - - I said, if you see that it's going to cost any more, would you please give me a call?

He said, yes, I will.

Mr. Cleaver testified: "Cost plus was never discussed. That was never discussed between me and Henry Apple." Mr. Cleaver heard nothing further from Plaintiff until Defendant received the invoice. Defendant never received anything showing a breakdown of materials or hours worked on this project.

Mr. Cleaver testified that there were several inaccuracies in Mr. Parris' testimony. Mr. Cleaver testified there were only 40 pitch pockets not 45 as Plaintiff claims. Mr. Cleaver produced bills for the materials used to make the pitch pockets dated in January and February of 2002, in support of this testimony. Mr. Cleaver also stated: "I'm kind of confused because they keep talking about there was an existing rubber roof, and they roof I walked across wasn't a rubber roof. I mean, it was an old tar and gravel roof, built up tar and gravel."

Mr. Cleaver testified that he does expect to pay Plaintiff for the work, but that he threw the invoice in the trash can. He admitted that he does not know if the amount Plaintiff charged for materials or for labor is reasonable or not.

After trial, the Trial Court entered a Memorandum Opinion and Order finding and holding, *inter alia*:

> There is no enforceable contract between Parris and SCR. Parris expected to charge for its services and be paid by SCR. Further, SCR expected to pay Parris something for the waterproofing of the penetrations. Parris provided valuable services to SCR, which received and benefited (sic) from these services. It would be unjust for SCR to have received the benefit without paying for the services.

* * *

> The court has noticed that Mr. Parris had no specific records for the cost-plus as is customary in the industry.…It appears his testimony about the number of pitch pockets and the number of man hours per pitch pocket is erroneous. Mr. Parris answered initially that a markup of 10-15% is normal but then said his was 40% on materials.…The only specific materials used on the job and identified by the job foreman was (sic) 1 gallon of quick prime, 2 tubes of N/P-1 and one roll of 5" tape. According to Trial Exhibit 5, the 1 gallon of quick prime cost $20.00; 2 tubes of N/P-1 was $10.00 and 1 roll of 5" tape was $105.00. Thus, the "segregated" or "itemized cost" was $135.00 and not $3,234.00. Apparently Parris had the other materials at the job site for the roofing work and did not have to order new or many different supplies for the pitch pocket job. Usually, Parris also had employees on the site who could do the work for SCR.

> The court notes that quantum meruit is an equitable remedy. Parris does not have nearly as much equity on its side as does SCR. However, SCR is not without blame. In its initial answer, SCR denied any agreement with Parris. In the Answer to the Amended Complaint, SCR stated it had an agreement with Parris that the charge would not exceed $1,800.00. All in all, Mr. Cleaver's testimony was more credible. Parris certainly did not follow good business practices by specifying in separate records its labor costs for this job for SCR.

The court has determined that Parris should receive judgment against SCR for $3,613.50. The court arrived at this figure by allowing labor costs of $3,150.00 (1/2 of the billed amount), materials of $135.00, which total $3,285.00, and 10% of that figure for overhead and profit. Thus, judgment will be entered for Parris against SCR for $3,613.50. Although the judgment amount is less than Parris' bill (or costs, if Mr. Cleaver's testimony about his telephone call is correct), the judgment amount is still twice as high as SCR wanted to pay. It is because of the court's strong feeling that Mr. Cleaver tried to limit the cost to $1,800.00 that the testimony of Ronald Hall is not being used. In other words, Parris did not "do SCR right."

Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the Trial Court erred in calculating the reasonable value of the work; and, 2) whether the Trial Court erred in disregarding the testimony of Plaintiff's expert witness regarding the reasonable value of the work. Neither party takes issue with the Trial Court's holding that no enforceable contract existed between Plaintiff and Defendant and that quantum meruit is the appropriate remedy.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

We first will consider whether the Trial Court erred in calculating the reasonable value of the work. Plaintiff argues, in large part, that the Trial Court erred in calculating the labor and materials costs despite "undisputed evidence" and in "derogation of the factors to be considered in establishing a quantum meruit recovery." Plaintiff argues that it produced proof of the reasonable value of the work both through the testimony of Mr. Parris and the testimony of Mr. Hall. Mr. Parris testified regarding the time and materials used, the method used to arrive at the total invoice price, and Plaintiff's usual and customary charges. Mr. Hall opined that Plaintiff's charges were reasonable and that it would have cost his company, one of Plaintiff's competitors, even more to perform the same work. Plaintiff argues that Defendant produced no evidence that the labor and materials charges billed by Plaintiff were unreasonable and "introduced no evidence whatsoever as to the reasonable value of the services performed by [Plaintiff]." Plaintiff also argues that the Trial Court incorrectly multiplied the number of pitch pans installed by eight man-hours instead of the four man-hours that Mr. Parris testified it took to install each pitch pan and that the Trial Court failed to accurately consider the amount of materials Plaintiff used on the job.

In *Castelli v. Lien*, this Court explained:

Liability under quantum meruit is based on a legally implied promise to pay a reasonable amount for goods or services received. Thus, quantum meruit recoveries are limited to the actual value of the goods or services, not their contract price. Courts will not award quantum meruit recoveries without some proof of the reasonable value of the goods or services, but the required proof may be an estimation of the value of the goods and services.

*Castelli v. Lien*, 910 S.W.2d 420, 427-28 (Tenn. Ct. App. 1995) (citations omitted). "Tennessee law is clear that an award in *quantum meruit* is not to be determined by the value of the services to the one who performs the services, but instead, should be based on the *value of the benefit conferred*." *Johnson v. Hunter*, No. M2000-03099-COA-R3-CV, 2001 Tenn. App. LEXIS 795, at \*18-19 (Tenn. Ct. App. Oct. 25, 2001), *no appl. perm. appeal filed* (emphasis in original).

Plaintiff relies upon, *Nations Rent of Tennessee, Inc. v. Lange*, which provides that in a suit for quantum meruit:

The reasonable value of goods and services may be proven in several ways. The party seeking to recover in quantum meruit can explain the method used to arrive at a base fee and markup. Additionally, proof as to reasonable value can be obtained from other professionals or experienced workers in that field.

*Nations Rent of Tennessee, Inc. v. Lange*, No. M2001-02368-COA-R3-CV, M2001-02360-COA-R3-CV, M2001-02366-COA-R3-CV, 2002 Tenn. App. LEXIS 799, at \*5 (Tenn. Ct. App. Nov. 6, 2002), *no appl. perm. appeal filed*. These listed methods, however, are not mandatory or exclusive.

We note that the Trial Court specifically found Mr. Cleaver's testimony to be more credible. On appeal, we defer to the Trial Court's credibility determinations. The record on appeal reveals that Defendant could have achieved its objective of re-routing the electrical conduit by an alternative method, i.e., trenching rather than going over the roof, for $1,800. Thus, the benefit to Defendant of having the electrical conduit re-routed as it was is $1,800. Given this, there is no need to resort to using another method of calculating the reasonable value of the work. The reasonable value of the work as measured by the benefit to Defendant is $1,800, as the Defendant could have achieved its objective at a cost of $1,800.

Although the Trial Court awarded a judgment $3,613.50, Defendant does not argue on appeal that the Trial Court erred in awarding the judgment in this amount. Therefore, we need not address whether it was error for the Trial Court to award a judgment in this amount rather than a lesser amount. We affirm in its entirety the Trial Court's December 23, 2005 Memorandum Opinion and Order awarding Plaintiff $3,613.50.

Our resolution of the first issue pretermits the necessity of considering Plaintiff's second issue.

## **Conclusion**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Parris Roofing & Sheetmetal Co., and its surety.

_____
D. MICHAEL SWINEY, JUDGE